No. 11-1565

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **Plaintiff-Appellee,** | ) | **Appeal from the Eastern District** |
| | ) | **of Wisconsin, Milwaukee Division** |
| **vs.** | ) | **No. 06 CR 327** |
| | ) | **The Honorable Charles N. Clevert,** |
| **HENRY BROWN** | ) | **Judge Presiding** |
| | ) | |
| **Defendant-Appellant.** | ) | |

## REPLY BRIEF OF
## DEFENDANT-APPELLANT HENRY BROWN

**William S. Stanton**
**53 W. Jackson Blvd., Suite 1062**
**Chicago, IL 60604**
**(312) 588-1283**
*Attorney for Defendant-Appellant Henry Brown*

## ORAL ARGUMENT REQUESTED

# TABLE OF CONTENTS

TABLE OF AUTHORITIES……………………………………..…………………………………iii

ARGUMENT………………………………………………………………………………....…1

I.     The GPS Monitoring Violated the Fourth Amendment ……………………..………1

    A.  Standard of Review …………………………………………………………....…1

    B.  Forfeiture Did Not Occur ……………………………………………………..………1

    C.  Brown Was Harmed By the Error ………………………………………..………2

        i.     There Was Error ………………………………………………………6

        ii.    The Error Was Plain …………………………………………..………6

        iii.   The Error Affected Brown's Substantial Rights ………………..………6

        iv.   Failure to Correct the Error Would Undermine the Integrity and Fairness of Brown's Trial, and Affect the Public Reputation of the Judicial Proceedings ……………………………………………..7

    D.  Brown Has Standing to Assert a Fourth Amendment Violation ……………8

    E.  The Independent Source Doctrine is Inapplicable …………………..………9

    F.  Inevitable Discovery Does Not Apply ………………………………………10

    G.  The Exclusionary Rule Applies …………………………………………14

    H.  Absent Reliance on Information Obtained Illegally, the Warrant to Search 1441 Morris Avenue Lacked Probable Cause ……………………14

II.    The Fifth Amendment Was Likewise Violated …………………………………16

III.   The Rimland Affidavit ……………………………………………………………17

IV.   Limitation of Cross-Examination of Troy Lewis Was Abuse of Discretion …....19

    A.  Standard of Review …………………………………………………………19

        i.     Brown Had a Substantial Right to Cross-Examine Troy Lewis About Lewis' Conspiratorial Relationship With Lewis' Brother, and the Denial of That Right Was Not Harmless ………………………20

i

V.    Under *United States v. Jackson*, 572 F.2d 636 (7th Cir. 1978), the
        Erroneous Introduction of Flight Evidence Was Not Harmless …………….…21

CONCLUSION……………………………………………………………………………..23

# TABLE OF AUTHORITIES

## CASES

*Commonwealth v. Connolly*, 454 Mass. 808 (Mass. 2009) …………………………….....….…1

*Davis v. United States*, 564 U.S. ___ (2011) …………………………………………………15

*Elkins v. United States*, 364 U.S. 206 (1960) ……………………………………………….7

*Fahy v. Connecticut*, 375 U.S. 85 (1963) …………………………………………....……2, 7

*Gouled v. United States*, 255 U.S. 298 (1921) ……………………………………………….7

*Henderson v. United States*, ___ U.S. ___ (2013) ……………………………………………..6

*Johnson v. United States*, 604 F.3d 1016 (7th Cir. 2010) ……………………………....…..6, 9

*Jordan v. Binns*, 712 F.3d 1123 (7th Cir. 2012) …………………………………………....19

*Katz v. United States*, 389 U.S. 347 (1967) ……………………….…………..…………..6, 13, 14

*Mapp v. Ohio*, 367 U.S. 643 (1961) …………………………………………………………2, 7

*Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009) …………………………………...17

*Nardone v. United States*, 308 U.S. 338 (1939) ……………………………………………….7

*Owens v. United States*, 387 F.3d 607 (7th Cir. 1994) ………………………………………15

*Palmer v. Hoffman*, 318 U.S. 109 (1943) ……………………………………………………19

*Peltier v. United States*, 422 U.S. 531 (1974) …………………………………………….....8

*Pointer v. Texas*, 380 U.S. 400 (1965) ……………………………………………………21

*Richardson v. Marsh*, 481 U.S. 200 (1987) ………………………………………………21

*Silverthorne Lumber Co. v. United States*, 251 U.S. 385 (1920) …………………………….....7

*Stoner v. California*, 376 U.S. 483 (1964) …………………………………………………3, 4, 20

*Sullivan v. Louisiana*, 508 U.S. 275 (1993) ………………………………………………….6

*Sussman v. Jenkins*, 636 F.3d 329 (7th Cir. 2011) ……………………………………....…20, 21

*Weeks v. United States*, 232 U.S. 383 (1914) …………………………………………………6, 7

*United States v. Alvarado-Valdez*, 521 F.3d 337 (5th Cir. 2008) ………………………………..19

*United States v. Bustamonte*, 687 F.3d 1190 (9th Cir. 2012) ………………………………………19

*United States v. Corona-Gonzalez*, 628 F.3d 336 (7th Cir. 2010) ………………………………...7

*United States v. Dichiarinte*, 445 F.2d 126 (7th Cir. 1971) ……………………………………3, 5

*United States v. Durham*, 645 F.3d 883 (7th Cir. 2011) ………………………………………..7

*United States v. Espinoza*, 256 F.3d 718 (7th Cir. 2001) ………………………………….…...11

*United States v. Garcia*, 474 F.3d 994 (7th Cir. 2007) ……………………………………....1

*United States v. Goodwin*, 717 F.3d 511 (7th Cir. 2013) ………………………………………7

*United States v. Groves*, 470 F.3d 311 (7th Cir. 2006) ………………………………………....7

*United States v. Heft*, 413 F.2d 1027 (7th Cir. 1969) …………………………………….…..6

*United States v. Ienco*, 182 F.3d 517 (7th Cir. 1999) ……………………………………….10

*United States v. Jackson*, 572 F.2d 636 (7th Cir. 1978) …………………………….…...21

*United States v. Johnson*, 457 U.S. 537 (1982) ………………………………………………..7

*United States v. Johnson*, 380 F.3d 1013 (7th Cir. 2004) ……………………………………10

*United States v. Jones*, 565 U.S. ___ (2012) ………………………………………….…...1, 6, 9

*United States v. Karo*, 468 U.S. 705 (1984) ……………………………………………………9

*United States v. Lee*, 860 F.Supp.2d 560 (E.D. Ky. 2012) ………………………….…...5, 10

*United States v. Markling*, 7 F.3d 1309 (7th Cir. 1993) …………………………………....15

*United States v. Martin*, 712 F.3d 1080 (7th Cir. 2013) ……………………….……14

*United States v. McDonald*, 453 F.3d 958 (7th Cir. 2006) …………………………….….14

*United States v. Newsome*, 402 F.3d 780 (7th Cir. 2004) ……………………………………15

*United States v. Nikrasch*, 367 F.2d 740 (7th Cir. 1966) …………………………………….6

*United States v. Olano*, 507 U.S. 725 (1993) ……………………………………..…………………..1

*United States v. Ottersburg*, 76 F.3d 137 (7th Cir. 1996) …………………………………………..7

*United States v. Pipito*, 861 F.2d 1006 (7th Cir. 1986) …………………………………....…….16

*United States v. Sura*, 511 F.3d 654 (7th Cir. 2007) …………………………………………..…7

*United States v. Taylor*, 471 F.3d 832 (7th Cir. 2006) …………………………………………..7

*United States v. Towns*, 718 F.3d 404 (5th Cir. 2013) …………………………………………19

*United States v. Underwood*, 130 F.3d 1225 (7th Cir. 1997) …………………………………….6

*United States v. Viola*, 35 F.2d 37 (2nd Cir. 1994) …………………………………………….2

*United States v. Walker*, 673 F.3d 649 (7th Cir. 2011) …………………………………………19

*United States v. Williams*, 81 F.3d 1434 (7th Cir. 1996) …………………………………….22

*United States v. Yeley-Davis*, 632 F.3d 673 (10th Cir. 2011) …………………………………...19

*Wong Sun v. United States*, 371 U.S. 471 (1963) ……………………………………….…7, 10

## OTHER AUTHORITIES

Federal Rule of Appellate Procedure 52(a) …………………………………………………1, 2

Federal Rule of Appellate Procedure 52(b) …………………………………………………1

Federal Rule of Evidence 803(6) …………………………………………………………..…19

## ARGUMENT

### I.    The GPS Monitoring Violated the Fourth Amendment

#### A.  Standard of Review

Brown properly preserved his argument concerning a Fourth Amendment violation by arguing against the propriety of the use of GPS evidence pre-trial and post-trial.  Thus, Federal Rule of Appellate Procedure 52(a) applies.  *Cf., Commonwealth v. Connolly*, 454 Mass. 808, 818 n.10 (Mass. 2009).

#### B.  Forfeiture Did Not Occur

While confessing that *United States v. Garcia*, 474 F.3d 994 (7th Cir. 2007), foreclosed any challenge to the constitutionality of warrantless GPS use while Brown's case was pending before the district court, and that *United States v. Jones*, 565 U.S. ___ (2012), was not decided until after Brown's case was appealed, the Government argues that "the most searching review Brown can obtain is plain error review." Gov't Br. 25.

Federal Rule of Appellate Procedure 52(a) provides the right to review errors affecting a defendant's substantial rights.  Rule 52(b) provides the right to review errors affecting a defendant's substantial rights which were "forfeited."  In *United States v. Olano*, 507 U.S. 725 (1993), the Supreme Court addressed Rule 52(b): "Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right."  *Id*. at 733-34.

Brown neither waived nor forfeited any right to object to the constitutionality of the GPS evidence.  Rather, a supervening decision abrogated circuit precedent.  Brown had no right to object on Fourth Amendment grounds to the legality of evidence obtained via warrantless GPS use which, at the time of trial, was sanctioned under established precedent.  Brown cannot be

said to have forfeited a right by not making a timely objection, since at the time of trial no legal right existed.  If this Court were to punish Brown for failing to challenge settled precedent, this Court would be insisting upon defendants' omniscience about the course of law that appellate tribunals do not have as judges; imposing such a duty would only encourage frivolous objections and appeals.  *United States v. Viola*, 35 F.3d 37, 42 (2nd Cir. 1994).  When the source of an error is a supervening decision, the defendant has not been derelict in failing to object at trial, and thus there is no cause to shift the burden of proving prejudice to the defendant.  *Id*.

In *Fahy v. Connecticut*, 375 U.S. 85 (1963), the Supreme Court confronted this rare circumstance and held that the requirements of Rule 52(a) remained applicable.  In *Fahy*, state court precedent precluded a defendant from objecting to and moving to suppress illegally-obtained evidence.  During the interim of the defendant's direct appeal process, the Supreme Court decided *Mapp v. Ohio*, 367 U.S. 643 (1961), which abrogated the state court precedent that had foreclosed Fahy's claim.  Holding Rule 52(a) applicable, and the defendant's failure to object under this unique circumstance not fatal, the Court stated: "[T]he defendants were not allowed to pursue the illegal search and seizure inquiry at trial because, at the time of trial, the exclusionary rule was not applied in Connecticut state courts.  Thus, petitioner was unable to claim at trial that the illegally-seized evidence induced his admissions and confession.  Petitioner has told the Court that he would so claim were he allowed to challenge the search and seizure as illegal at a new trial.  And we think that such a line of inquiry is permissible… Thus, petitioner should have a chance to show that his admissions were induced by being confronted with illegally-seized evidence."  *Id*. at 90-91.

## C. Brown Was Harmed By the Error

Illustrating that the illegal GPS use "contributed" to Brown's convictions are the

following "testimonial" "communications" that were unlawfully extracted from Brown and employed at trial: (a) notice and verification – **by Brown** – of Brown's August 2, 2006, travels to, and minute-by-minute locations in and around, Chicago, Illinois (i.e., the "source" city informant Arms indicated to Detective Baker that Brown would be traveling to in order to obtain the requested cocaine); (b) notice – **by Brown** – of the "identity" of 1441 Morris Avenue in Berkeley, Illinois; (c) notice and verification – **by Brown** – of Brown's August 2, 2006, travel to and connection with the 1441 Morris Avenue residence; (d) notice and verification – **by Brown** – of Brown's August 2, 2006, through August 5, 2006, storage of the Jeep at the 1441 Morris Avenue residence for the interval preceding the requested drug transaction; (e) notice and verification – **by Brown** – of Brown's August 5, 2006, 2:00 p.m. transfer of the Jeep to Troy Lewis at the 1441 Morris Avenue residence; and (f) verification – **by Brown** – of the August 5, 2006, departure of the Jeep from the 1441 Morris residence, leading to (and allowing for) the August 5, 2006, sham traffic stop and search of the Jeep by members of the Racine County Sheriff's Department, resulting in the discovery of the ten kilograms of cocaine.  Compare, e.g., *United States v. Dichiarinte*, 445 F.2d 126 (7th Cir. 1971) ("We must next determine whether the Government used any of the seized items in building their case.  The defendant was not harmed if neither the items seized nor the 'fruits' were instrumental in securing his conviction."); *Stoner v. California*, 376 U.S. 483, 490 n.8 (1964) ("The admission in a criminal trial of evidence obtained by an unlawful search is not harmless error where the conviction depended in large part upon the jury's resolution of the question of the credibility of witnesses, and that determination must almost certainly have been influenced by the incriminating nature of the physical evidence illegally seized and erroneously admitted, there being at least a reasonable probability that the evidence complained of might have contributed to the conviction.")

Compounding the prejudice are the Government's repeated references to, and reliance on, this evidence during trial:

(1) Opening statement, Opening Tr.7: AUSA O'Neil: "The defendant took Kevin Arms' car to Chicago.  Fortunately, law enforcement was able to know where the defendant took Kevin Arms' car because they had already placed a GPS tracking device on the car, so they knew where it went, where it was staying, and when it was moving."

(2) Direct Examination of Officer Edward Drewitz, Tr.39: AUSA Resler: "Were you working on Saturday, August 5th of 2006?" Drewitz: "Yes."  Resler: "And what was your assignment that day?" Drewitz: "To patrol I-94 in Racine County and its corridor." Resler: "Specifically, in the afternoon hours, were you looking for something in particular?" Drewitz: "Yes, we were given information on a specific vehicle that was coming from Chicago and destined for Milwaukee and traveling via I-94 through Racine County."

(3) Opening Statement, p.7, AUSA O'Neil: "Through the GPS on Mr. Arms' car, they knew that that was going to be the car bringing drugs back up.  And sure enough, with the assistance of the Racine County Sheriff's Department, the Deputy pulled over Mr. Arms' car…looked in the back of the car, lo and behold the suitcase with ten kilograms of cocaine in it."

(4) Direct Examination of Detective Baker, Tr. 137: AUSA O'Neil: "Going to August 5th now. Approximately what time did the vehicle start – or what time did the vehicle leave the 1400 block of Morris Avenue in Berkeley?" Baker: "I would say it was close to the 2 o'clock hour." AUSA O'Neil: "Did there come a time when you left the Racine County Sheriff's Department that day?"  Baker: "Yes."  AUSA O'Neil: "Where did you go?"  Baker: "To the south end of Racine County to a Park and Ride lot with a laptop computer."  AUSA O'Neil: "And what was the purpose of that?"  Baker: "I was monitoring the GPS unit."

4

(5) Detective Baker, cross-examination, Tr.201: Defense counsel: "You tell them, listen guys, we got a narcotics investigation going on, there's a black Jeep Cherokee going to be headed up I-94 with a bunch of dope?" Baker: "Yes." Defense counsel: "We want you to stop the car?" Baker: "Yes." Defense counsel: "And we want you to write up some reports after you stop the car leaving out the fact that we're involved, correct?" Baker: "Yes."

(6) Government Rebuttal Closing Argument, Closing Tr.61-64: AUSA Resler: "Sure enough, Troy Lewis shows up. Kevin Arms said the initial meeting was down at 1441 Morris, basically Mr. Brown's sister's home. That was confirmed by Troy Lewis. GPS device on the car confirms that the vehicle went down to 1441, and that's where we find all the dope… The ten kilos that came up. The GPS device again at 1441. The drugs that were found at 1441…We don't hear much about the fact that Mr. Brown paid for Troy Lewis's attorney, that he fled from Westchester… Now we find a receipt that Mr. Brown paid $10,000 cash for Troy Lewis, a guy he apparently didn't know was a drug dealer. Okay? His nephew was in all this trouble and he just ponies up the cash to protect this guy after he took the vehicle up to Milwaukee." Cf., *Dichiarinte*, supra.

In a strained effort to limit the reach of the Fourth Amendment violation, the Government argues that it received notice of Troy's return on August 5, 2006, from informant Arms, and not from the illegal GPS monitoring. While Arms very well may have alerted Detective Baker that Arms had received a call from Troy and would be expecting to meet with Troy to consummate the deal, only the GPS device was able to and did give Baker notice of the departure time of the Jeep, its point of departure, the route of the Jeep, and the real-time location of the Jeep so that the ruse "stop and search" could be coordinated. Compare, e.g., *United States v. Lee*, 860 F.Supp.2d 560 (E.D. Ky. 2012).

Assuming, arguendo, that this Court decides that plain error review is appropriate, Brown can meet this standard.  Compare, e.g., *United States v. Heft*, 413 F.2d 1027 (7th Cir. 1969) (finding plain error for introduction of evidence obtained in violation of the Fourth Amendment); *United States v. Nikrasch*, 367 F.2d 740 (7th Cir. 1966) (same).

### i.     There Was Error

The Government admittedly employed the GPS device to track and record the Jeep's movements and locations for the entirety of the period Brown personally possessed and exhibited a reasonable expectation of privacy in the Jeep.  Namely, the GPS was used during Brown's travels from the August 2, 2006, meeting with Arms; his travels in and around Chicago in the Jeep until mid-evening on August 2, 2006, and his storage of the Jeep in his garage on the night of August 2, 2006, all of August 3rd and 4th, up until approximately 2:05 p.m. on August 5, 2006, when Brown removed the vehicle from the garage and turned it over to Troy Lewis (per the testimony of Troy Lewis, Tr.470).  Under *United States v. Jones*, 565 U.S. ___ (2012), *Katz v. United States*, 389 U.S. 347 (1967); and *Johnson v. United States*, 604 F.3d 1016 (7th Cir. 2010), this was error.

### ii.     The Error Was Plain

Under *Henderson v. United States*, ___ U.S. ___ (2013), the error was without question "plain."

### iii.     The Error Affected Brown's Substantial Rights

"A right is 'substantial' when it is one of the pillars of a fair trial."  *United States v. Underwood*, 130 F.3d 1225, 1230 (7th Cir. 1997), citing *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993).  The right not to be tried and convicted under Governmental use of illegally-obtained evidence is the most essential pillar to the concept of a fair trial.  See, e.g., *Weeks v. United*

*States*, 232 U.S. 383 (1914); *Silverthorne Lumber Co. v. United States*, 251 U.S. 385 (1920);

*Gouled v. United States*, 255 U.S. 298 (1921); *Nardone v. United States*, 308 U.S. 338 (1939);

*Wong Sun v. United States*, 371 U.S. 471 (1963); *Mapp v. Ohio*, 367 U.S. 643 (1961); *Fahy v.*

*Connecticut*, 375 U.S. 85 (1963); and *Stoner v. California*, 376 U.S. 463 (1964).

Undoubtedly, Brown's Fourth Amendment rights are as substantial as those affected in

prior cases finding plain error.  See, e.g. *United States v. Durham*, 645 F.3d 883 (7th Cir. 2011);

*United States v. Corona-Gonzalez*, 628 F.3d 336 (7th Cir. 2010); *United States v. Taylor*, 471

F.3d 832 (7th Cir. 2006); *United States v. Sura*, 511 F.3d 654 (7th Cir. 2007); *United States v.*

*Groves*, 470 F.3d 311 (7th Cir. 2006); *United States v. Ottersburg*, 76 F.3d 137 (7th Cir. 1996);

*United States v. Goodwin*, 717 F.3d 511 (7th Cir. 2013).

The Government's introduction and use of illegally-obtained evidence to convict Brown

therefore abridged his substantial right to a fair trial.  Moreover, but for the jury's consideration

of the illegally-obtained evidence, including the direct and derivative "fruits" of that evidence,

Brown would have been acquitted.  Put another way, virtually no constitutionally sufficient

evidence existed (i.e., legally-obtained evidence proving beyond a reasonable doubt that Brown

committed the charged offenses.)

### iv.      Failure to Correct the Error Would Undermine the Integrity and Fairness of Brown's Trial, and Affect the Public Reputation of the Judicial Proceedings

Interests of judicial integrity, as articulated by the Supreme Court, support correction of

this "plain" and "prejudicial" error.  Cf., *Elkins v. United States*, 364 U.S. 206, 222-23 (1960)

(outlining the "imperative of judicial integrity" which warrants judicial redress for Fourth

Amendment violations); *United States v. Johnson*, 457 U.S. 537, 560 (1982) ("If, as the

Government argues, rulings resolving unsettled Fourth Amendment questions should be

[exempted from judicial redress and application of the exclusionary rule] then, in close cases,

law enforcement would have little incentive to err on the side of constitutional behavior."); *Peltier v. United States*, 422 U.S. 531, 554-57 (1974) ("The advantage of the exclusionary rule – entirely apart from any direct deterrent effect – is that it provides an occasion for judicial review, and it gives credibility to the constitutional guarantees.")

### D. Brown Has Standing to Assert a Fourth Amendment Violation

The Government effectively concedes, as it must, that the use of GPS technology to track the movements and locations of a private vehicle constitutes a "search" for Fourth Amendment purposes. It also concedes that Brown was in actual and lawful possession of the Jeep from his departure in the Jeep at the car swap on August 2, 2006, up until approximately 2:05 p.m. on August 5, 2006, when Brown turned the Jeep over to Troy Lewis.

The Government argues that Brown lacks standing under the Fourth Amendment because he cannot prove at which particular points during this period he was driving the Jeep. The Government frames its argument as: "Brown did have permission to use the vehicle, and such non-owner drivers may have an expectation of privacy within the vehicle. So, the critical question is, when was Brown driving the vehicle with the owner's permission? We know that Brown drove it away from the meeting with Arms on August 2nd. And we know that he was not in the vehicle when it was stopped several days later with 10 kilograms of cocaine headed for Milwaukee. In between, he asks us to assume that he was the driver, and that the Government surreptitiously monitored his movements contrary to the Fourth Amendment." Gov't Br.27. This argument entirely misses the mark.

As reflected by the record, for the substantial majority of the period the Jeep was monitored, Brown kept it parked in his garage. Accordingly, it is irrelevant when Brown was "driving the vehicle with the owner's permission." Instead, the constitutionally relevant question

is during which portions of this period did Brown possess and exhibit a reasonable expectation of privacy with the Jeep – an expectation society accepts as reasonable that was infringed by Government officials?  The answer is simple: The entirety of the period Brown drove the vehicle (i.e., from the August 2nd meeting until he got home), and the entirety of the period Brown kept the vehicle stored in his garage.  Cf., *United States v. Jones*, 565 U.S. ___ (2012); *Johnson v. United States*, 604 F.3d 1016 (7th Cir. 2010).  Compare also, *United States v. Karo*, 468 U.S. 705 (1984) (holding Fourth Amendment violated by electronic surveillance which breached curtilage of defendant's home).

The Government admittedly tracked and recorded the Jeep's movements and locations during the entirety of this period.  Accordingly, an illegal search definitely – and perpetually – occurred.  See Gov't Br. at 10 ("Detective Baker testified that, using his laptop, he was able to track the GPS's signal.  Detective Baker testified that based upon the GPS signal, [the Jeep] first traveled to the 'west side of Chicago,' then in the evening was parked approximately mid-block on Morris Street in Berkeley, Illinois, where it remained parked on August 3 and 4, 2006.")  See also, A3 (grand jury minutes of May 6, 2008), pp.6-7 (Special Agent Matthew Yeager confirming 1441 Morris Avenue as the particular residence from which the GPS device emitted its signal for the entirety of August 3, 4, and part of August 5th, when the Jeep was handed over to Troy Lewis); A15, ¶ O (Affidavit of Detective Baker affirming same).

**E.  The Independent Source Doctrine is Inapplicable**

The Government contends that the "identity" of 1441 Morris Avenue was discovered through two "independent" sources: the driver's license tendered by Markita Brown during her August 5, 2006, arrest, and the confirmation by Arms when taken to the residence that Henry Brown lived there.  As the record clearly shows, though, Detective Baker first discovered the

identity of 1441 Morris Avenue and its connection to Brown through illegal GPS use.  See Gov't Br. at 10; A3; A15, supra.  Armed with this information, three months later Government agents took informant Arms to 1441 Morris Avenue requesting confirmation that the residence was one associated with and controlled by Brown.  Arms confirmed such, and additionally declared the residence to be one he recalls having been used by Brown for a prior marijuana transaction between Brown and Arms.  Under these facts, Arms' "confirmation" of 1441 Morris Avenue as a residence connected to and used by Brown did not involve a matter "lawful" and "wholly independent" of the initial illegal search.  *Cf.*, *Wong Sun v. United States*, 371 U.S. 471, 484-88 (1963); *United States v. Johnson*, 380 F.3d 1013 (7th Cir. 2004).

The stop and search of Markita Brown in the Jeep was likewise a fruit of the prior illegal search, rendering the discovery of Markita – and her driver's license – an event likewise not "lawful" and "wholly independent" of the prior illegal search.  Specifically, without the GPS tracking data, Detective Baker would not have known that Brown traveled in the Jeep to Chicago; that he was connected to and stored the Jeep at 1441 Morris Avenue; that it departed that residence and was heading back to Milwaukee on August 5, 2006, at 2:05 p.m.; and that the Jeep was in "real-time" returning to Milwaukee along I-94.  Therefore, the discovery of Markita Brown – and her driver's license – was so inexorably intertwined with the illegal GPS use that it is impossible to conclude it was not a fruit of the illegal GPS use.  See, e.g., *United States v. Lee*, 862 F.Supp.2d 560, 564-67 (E.D. Ky. 2012).  Compare, also, *United States v. Ienco*, 182 F.3d 517, 530-31 (7th Cir. 1999).  In addition, the Racine County deputies determined the identification Markita Brown gave them to be fictitious, making it unlikely that the address it contained would prove evidentiary.  See Tr.42.

**F.  Inevitable Discovery Does Not Apply**

At trial, Deputy Drewitz testified to being instructed, in advance of the stop, to be on the lookout for the Jeep, which was suspected to contain cocaine and be heading toward Milwaukee on I-94.  Drewitz testified that he was instructed to develop probable cause for a "traffic" stop, and to conduct a search aimed at discovering a possible cache of cocaine.  Following that directive, Drewitz spotted the Jeep, performed the stop, conducted the search, and seized ten kilograms of cocaine.  Drewitz testified that he was instructed by his superiors, before the stop, to perform the stop and attribute the discovery of the contraband to a lawful search incident to the traffic stop.  Admitting the same, Detective Baker testified that he used this tactic to insulate the incident, conceal the existence of his informant, and to allow his informant an opportunity to move up the ladder to ensnare additional drug distributers.  See Tr.52-55 (Deputy Drewitz), 133-36 (Detective Baker).

Under those facts, any opportunity for a legal and inevitable discovery was sacrificed by Detective Baker through his intentional exploitation of the GPS data to conduct the sham stop.  Inevitable discovery does not apply under these facts.  That doctrine only applies where police officials were destined to discover the exact same evidence through lawful means, not where they possibly could have obtained the same evidence by lawful means but chose to obtain it in an unlawful manner.  Cf., *United States v. Espinoza*, 256 F.3d 718, 732 (7th Cir. 2001) (Wood, circuit judge, dissenting) ("The inevitable discovery and independent source doctrines have been consistently construed so as to preserve suppression as a remedy designed to deter police misconduct… The kind of wholesale 'we could have conducted a proper search' approach urged by the Government [defeats this goal and must be continually rejected].")

Detective Baker's testimony on cross-examination illustrates that any plan to obtain evidence through lawful means had not been fully formulated at the time of the illegal stop.

Instead, Baker planned to formulate a back-up plan if – and only if – his illegal plan failed.  See Tr. 199-200, (Defense counsel: "Now, on the 5th, you indicated that you got a call from Arms and Arms told you that he had been called by Troy, correct?" Baker: "Correct." Defense counsel: "And that he had been told by Troy that he was coming up to meet Arms, correct?" Baker: "Correct." Defense counsel: "And Troy told him that he was coming up to meet him and he was gonna bring 10 kilos, correct?" Baker: "Correct." Defense counsel: "And they discussed, at least in terms of what you were told by Arms, that they were gonna meet at a particular location? Or did you give them this secondary plan location?" Baker: "That plan, we did not give any locations.  All we know is that there was going to be a follow-up call from Troy that he was on his way toward Wisconsin and that the final meet location would be decided."  Defense counsel: "And there was no attempt to reach out for Henry Brown on that day, was there?" Baker: "No." Defense counsel: "In any event, after you talked to Arms and after you knew that Mr. Lewis was on his way to Wisconsin, you called the Racine County Metro Drug Unit, didn't you?"  Baker: "The Racine County Drug Unit, correct."  Defense counsel: To enlist their cooperation, correct?" Baker: "Correct."  Defense counsel: "You tell them, listen guys, we got a narcotics investigation going on, there's a black Cherokee going to be headed up I-94 with a bunch of dope in it." Baker: "Yes." Defense counsel: "We want you to stop the car." Baker: "Yes." Defense counsel: "And we want you to write some reports after you stop the car leaving out the fact that we're involved, correct?" Baker: "Yes."  Defense counsel: "All right.  That was your decision."  Baker: "Yes."  Defense counsel: "In collaboration with who?"  Baker: "The United States Attorney's office."  Defense counsel: "And that car was stopped and in the back of that car was this suitcase that you've alluded to?" Baker: "Yes.")

12

Assessing these facts, a simple – yet crucial – question emerges: Are the planned "fruits" of an unlawful search the "fruits" of that search upon fruition?  Providing the correct answer, the Supreme Court overturned a conviction and suppressed evidence in a seminal case remarkably similar in context.  In *Katz v. United States*, 389 U.S. 347 (1967), Government officials possessed the caliber of probable cause necessary to have obtained a warrant, but failed to do so, and tried to rely on this "probable cause" to salvage their constitutionally-offensive conduct.  Holding the Fourth Amendment to be an absolute bar against such a claim, the Court reasoned: "The Government urges that, because its agents… did no more here than they might properly have done with prior judicial sanction, we should retroactively validate their conduct.  That we cannot do.  It is apparent that the agents in this case acted with restraint.  Yet the inescapable fact is that that restraint was not imposed by a judicial officer.  They were not required, before commencing the search, to prepare their estimate of probable cause for detached scrutiny by a neutral magistrate.  They were not compelled, during the conduct of the search itself, to observe precise limits established in advance by a specific court order.  Nor were they directed, after the search had been completed, to notify the authorizing magistrate in detail of all that had been seized.  In the absence of such safeguards, this Court has never sustained a search upon the sole ground that officers reasonably expected to find evidence of a particular crime and voluntarily confined their activities to the least intrusive means consistent with that end.  Searches conducted without warrants have been held unlawful 'notwithstanding facts unquestionably showing probable cause,' for the Constitution requires 'that the deliberate, impartial judgment of a judicial officer be interposed between the citizen and the police.'  Over and again, this Court has emphasized that the mandate of the Fourth Amendment requires adherence to the judicial processes, and that searches conducted outside the judicial process, without prior approval by a

judge or magistrate, are per se unreasonable under the Fourth Amendment – subject to only a few specifically established and well-delineated exceptions." *Id*. at 356-57.

To reward Detective Baker for this official misconduct would constitute an invitation for illegal searches in a majority of undercover cases, with the precedential promise that the Court will sustain them under post-search assertions of what Government officials "could have" lawfully done, but deliberately "chose" not to do. Imposing the requirements of the Fourth Amendment will not interfere with any governmental interests. Instead, it will simply require Government officials, before installing and monitoring GPS devices, to obtain a warrant. The Fourth Amendment requires no more, and guarantees no less.

### G.  The Exclusionary Rule Applies

This Court's decision in *United States v. Martin*, 712 F.3d 1080, 1082 (7th Cir. 2013), correctly rejected the Government's invitation to extend *Davis v. United States*, 564 U.S. ___ (2011), beyond the parameters carefully crafted by the Supreme Court. In *United States v. McDonald*, 453 F.3d 958, 962 (7th Cir. 2006), this Court held that the good faith exception did not apply where the law was unsettled at the time. The *Martin* and *McDonald* decisions were correct and must be followed.

The law enforcement conduct to deter is manifest: invasion of privacy via GPS surveillance without prior judicial approval. At the time of the monitoring, there was no precedent in place that would allow Government agents to invade the rights of citizens in this manner. As such, the Government must be made to swallow this "bitter pill." Gov't Br.30.

### H.  Absent Reliance on Information Obtained Illegally, the Warrant to Search 1441 Morris Lacked Probable Cause

But for Detective Baker's "exploitation" of data emitted from the illegally-used GPS

device, the identity of 1441 Morris Avenue – and its connection to Brown – would not have become known.  After excluding this unlawfully-obtained information, and the fruits thereof, the affidavit in support of the application for a warrant to search 1441 Morris Avenue in November of 2006 contained insufficient facts to establish probable cause.

Specifically, the only incriminating information left in the affidavit (i.e., information establishing "probable cause" to believe evidence of a crime was located inside 1441 Morris Avenue) was 20 months old, making it unconstitutionally stale.  Detective Baker alleged in his affidavit only a single instance – in March of 2005 – where Arms allegedly purchased marijuana from Brown at the 1441 Morris Avenue residence.  Arms had subsequently been to prison to serve a significant sentence, and neither Arms nor Baker indicated knowledge that Brown was currently living at, remained criminally connected to, or continued to engage in illicit affairs at, the 1441 Morris Avenue residence.  Cf., *United States v. Newsome*, 402 F.3d 780, 782-83 (7th Cir. 2004) (The Fourth Amendment permits a search of a person's home only if there is probable cause to believe that the authorities will recover the items subject to the seizure at the time they execute the warrant.";  *Owens v. United States*, 387 F.3d 607, 608 (7th Cir. 1994).

Undeniably, information illegally-gained via warrantless GPS usage, (namely the GPS data indicating that Brown took the Jeep to, stored the Jeep at, and dispatched the Jeep from 1441 Morris prior to it being pulled over and found to contain 10 kilograms of cocaine) prompted Detective Baker to apply for the warrant to search 1441 Morris Avenue, and affected the decision of the magistrate judge to issue the warrant.  This undermines the validity of the application to search 1441 Morris Avenue, and the ensuing search warrant.  See, e.g., *United States v. Markling*, 7 F.3d 1309, 1315-16 (7th Cir. 1993) ([F]irst we ask whether any illegally obtained information affected the judicial officer's decision to issue a warrant; and second, we

consider whether the police officer's decision to seek the warrant was prompted by anything that was discovered during the illegal [surveillance]."

A prime example of how the GPS use – and the fruits thereof – could and likely did affect the reviewing magistrate's decision can be found in the December 11, 2008, "Recommendation on Defendant's Pretrial Motion" of Magistrate Judge Callahan, Jr. (R.84) (recommending denial of Brown's staleness claim because of evidence of continuing criminal activity at the 1441 Morris Avenue residence gained via GPS usage). Granted, Detective Baker included in his affidavit that Arms "confirmed" in November of 2006 that Brown was at one time connected to the 1441 Morris Avenue residence. Baker also averred that Arms had once consummated a marijuana transaction with Brown at that residence. However, as previously iterated, Arms' identification or "confirmation" of the 1441 Morris Avenue residence was a clear result of federal agents – who learned of the existence and identity of the home through unlawful means – taking Arms to the home and showing it to him for confirmation purposes. Arms did not volunteer that address.

## II.    The Fifth Amendment Was Likewise Violated

Absent a cognizable Fourth Amendment violation occurring, Brown possessed no cognizable Fifth Amendment self-incrimination clause argument.

Without illegally extracting – from Brown – each involuntary communication outlined in Brown's initial brief, the Government would not have been privy to a host of incriminating evidence used at trial. Cf., *United States v. Pipito*, 861 F.2d 1006, 1010 (7th Cir. 1986) (It is clear that the protection of the Fifth Amendment reaches an accused's communications, whatever form they might take.")

After extracting the evidence garnered in contravention of the Fourth and Fifth Amendments, insufficient evidence remains to convict Brown.

### III.     The Rimland Affidavit

Most certainly, the affidavit of Attorney Jack Rimland was introduced for the truth of the matter asserted as substantive evidence against Henry Brown.  If it were not true that the affidavit showing that the receipt for the $10,000 payment Rimland received was kept in the ordinary course of business and made at the time that the money was received, then it would not have been admissible.

The Government put the affidavit into evidence as Exhibit 93, and read it in its entirety to the jury.  The affidavit was important evidence because the Government used it to introduce documentary evidence of a conspiratorial relationship.  Like the eyesight analogy referenced in Brown's opening brief, this affidavit described the way the receipt was created, and did so in a manner that enhanced the reliability of the receipt.  The facts contained in the affidavit gave the jury reason to believe the receipt was true.

The Supreme Court was clear that there is no historical exception for this type of affidavit to be exempted from Confrontation Clause scrutiny.  *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 329 (2009).  The Court unequivocally held that the Government cannot prove aspects of its case using *ex parte* affidavits.  The only kind of *ex parte* affidavit that is admissible is one that certifies that a public record is a true and correct copy.  Plainly, Rimland's affidavit does not fit that category.

The affidavit employed in this case did much more than certify the correctness of a record.  Instead, it explained to the jury how that record was made.  Thus, it must be subject to the Confrontation Clause.

17

The affidavit and accompanying receipt were used by the Government to prove a matter disputed at trial – that Brown and Lewis had a conspiratorial relationship. We need look no further than the Government's opening statement to discern how this evidence was used: AUSA O'Neil, Opening Tr.8: "Mr. Troy Lewis is arrested and he's charged with possession with the intent to distribute that ten kilograms. Unfortunately for law enforcement, Troy Lewis decides not to cooperate. He does not corroborate or confirm what Kevin Arms has been telling law enforcement so far, 'yes, I'm a runner for the defendant, Henry Brown.' We later find out why. Probably has something to do with the fact that Henry Brown paid for Troy Lewis' attorney to the tune of $10,000, approximately six days after Troy Lewis was arrested."

During closing argument, AUSA Resler again harped on the issue several times: Closing Tr.10: "…Troy Lewis is arrested on August 5, 2006. As we'll hear shortly, six days later we see that someone – or Henry Brown's name shows up on a receipt paying $10,000 cash to an attorney for Troy Lewis. We hear that Troy Lewis isn't cooperating at that time. We further hear that there's no information out at that time that Kevin Arms was the informant. So Troy Lewis is in the hot seat at this point, he's the one who is caught, he's the one that Mr. Brown is worried about cooperating against him."; Closing Tr.62-63: "We don't hear much about the fact that Mr. Brown paid for Troy Lewis' attorney, that he fled from Westchester, and that he was arrested with fake ID's… Now we find a receipt that Mr. Brown paid $10,000 cash for Troy Lewis…"

At the motion in limine hearing on July 25, 2008 (R.53), AUSA Resler asserted (lines 1-11): "There was the other search warrant executed in Westchester, Illinois… That one, the most important thing that was found was the receipt dated August 11th for the payment of $10,000 to Attorney Jack Rimland who was representing Troy Lewis actually in this court. And I think it

establishes a connection between Mr. Brown and Mr. Lewis, and certainly that would tie them

both to the conspiracy and the fact that they were involved in the delivery of cocaine from

August 2006."

The facts of this case are much closer to *United States v. Bustamonte*, 687 F.3d 1190,

1194 (9th Cir. 2012) (certification concerning document was testimonial because it did more than

certify its correctness), than the cases cited in the Government's brief (*United States v. Yeley-

Davis*, 632 F.3d 673 (10th Cir. 2011) and *United States v. Towns*, 718 F.3d 404 (5th Cir. 2013)).

Under these examples, it is clear that the erroneous introduction of the affidavit and

receipt contributed to Brown's convictions.  Cf., *United States v. Alvarado-Valdez*, 521 F.3d 337,

342-43 (5th Cir. 2008) (holding, inter alia, that where the Government relies on the very evidence

that offends the Confrontation Clause in opening statement or closing argument, the error is not

harmless);  *Stoner*, supra.

The Rimland affidavit constituted testimonial hearsay.  Since Rimland was available and

the Government did not call him to testify at Brown's trial, Brown's right to confrontation was

violated.  See *United States v. Walker*, 673 F.3d 649, 658 (7th Cir. 2011).  What is more, the

Rimland affidavit was a document prepared in anticipation of litigation, which is inadmissible

under FRE 803(6).  See *Jordan v. Binns*, 712 F.3d 1123, 1135 (7th Cir. 2012), citing *Palmer v.

Hoffman*, 318 U.S. 109, 113-14 (1943).  This is evident from the fact that Rimland authored the

affidavit a mere five days before Brown's trial commenced.  Tr.422.

**IV.**    **Limitation of Cross-Examination of Troy Lewis Was An Abuse of Discretion**

    **A.  Standard of Review**

Through cross-examination, Brown aimed to expose a hidden motive and bias held by

Lewis.  By restricting that cross-examination, Brown's guarantees under the Confrontation

Clause were violated, rendering this claim subject to *de novo* review.  *Sussman v. Jenkins*, 636

F.3d 329, 357 (7th Cir. 2011).

> ### i.  Brown had a substantial right to cross-examine Lewis about Lewis' conspiratorial relationship with Lewis' brother, and the denial of that right was not harmless

The Government's case depended on the truthfulness of Troy Lewis and Kevin Arms.

Both Lewis and Arms testified that they were engaged in a drug trafficking conspiracy that

involved Brown, and that the ten kilograms recovered on August 5, 2006, belonged to Brown.

In an attempt to fully expose the character and bias of Lewis, defense counsel attempted

to introduce, through cross-examination, testimony from Lewis concerning Lewis' past multi-

million dollar conspiratorial relationship and drug-trafficking conviction he sustained with his

twin brother, Tory.  Arms had initially identified his drug suppliers as two brothers from Chicago

named Troy and Twin.  Only later did Arms change his tune, and declare his suppliers to be Troy

and Brown.  Detective Baker testified that the insertion of the name "Twin" in the report he first

penned was a mistake.  Tr.218.

Defense counsel discovered that Troy Lewis did indeed have a brother named "Twin,"

and the two had been convicted in 1995 for engaging in a large drug conspiracy.  Based on these

revelations, defense counsel sought to establish – through Troy's own testimony – that Arms'

first version of events was true.  Specifically, the defense wanted to establish that Henry Brown

was bilaterally used as a fall guy, while the true conspiratorial trio was Troy, Tory, and Arms.

Brown's cross-examination intended to show that Troy Lewis was trying to insulate his brother

and lessen his own sentence, and demonstrate that Kevin Arms would say anything to avoid an

indictment.

The factual scenario proposed by Brown, but foreclosed by the district court, had a reasonable probability of changing the outcome of Brown's trial. Denying that opportunity harmed Brown. Cf., *Sussman*, supra.

The Government argues that in contravention of the district court's ruling, defense counsel's closing argument highlighted the theory that Troy was covering up for Tory. Per the Government, the jury's guilty verdict proved that theory to be ineffective. That argument fails twofold.

First, the district court expressly instructed the jury that arguments of counsel were not evidence, and could not be considered as such. Presuming the jury to have followed this directive – as we must – Brown's jury refused to consider any argument the district court deemed improper. See, e.g., *Richardson v. Marsh*, 481 U.S. 200, 211 (1987). Second, Brown sought to expose the actual facts and substance of this theory through the most valuable means constitutionally available: the Sixth Amendment right of cross-examination, but was forbidden. Cf., *Pointer v. Texas*, 380 U.S. 400, 405 (1965); *Sussman*, supra.

## V.     Under *United States v. Jackson*, 572 F.2d 636 (7th Cir. 1978), the Erroneous Introduction of Flight Evidence Was Not Harmless

The crime forming the basis for Brown's indictment occurred on August 5, 2006. On November 21, 2006, federal agents executed a search warrant in Berkeley, Illinois, at the home of Brown's sister, Yvette Gray. According to the testimony of Agent Yeager, in the midst of executing the search warrant, he gave notice to Brown's brother, Randye Brown, that Henry Brown was wanted on a federal arrest warrant. Tr.346. Yeager also testified that he conveyed the same information to Henry Brown's former attorney, who had called during the execution of the search warrant, and requested the attorney to have Brown turn himself in to authorities. Tr.348.

Nine days later, on November 30, 2006, a plain clothes officer working alone in an unmarked car in Westchester, Illinois, attempted a traffic stop on a vehicle that contained Brown. Brown exited the vehicle and ran away. The Government urges this Court to rely on the unconfirmed transmissions of Agent Yeager to conclude that Brown knew of the outstanding warrant and engaged this chase in an effort to avoid apprehension on that warrant.

This approach has several glaring defects. First, no evidence demonstrates that it is "more probable than not" that Brown received notice of Yeager's communications. At the pretrial hearing, the Government failed to call any witnesses to prove or substantiate this matter. Instead, the Government asks this Court to assume Yeager's messages were successfully delivered.

Second, at the time the search warrant was executed, Troy Lewis was not cooperating. Thus, Brown had no reason to believe he was a target of the investigation.

Third, the district court held that the alleged communications of Brown's former attorney were subject to the attorney-client privilege, and therefore off-limits and insufficient to prove the truth of the matter asserted. R.53, pp.28, 36. Based on this ruling alone, the Government could never meet its burden.

Aggravating the matter, the Government highlighted the inculpatory nature of this evidence during both opening statement and closing argument. The district court also allowed this dangerous evidence to be considered by Brown's jury without an accompanying cautionary or limiting instruction. That error was not harmless.

The evidentiary rulings in this case cannot be viewed in a vacuum. When considered in conjunction with each other and the rest of the evidence presented, it is clear that their combined effect was prejudicial. See *United States v. Williams*, 81 F.3d 1434 (7th Cir. 1996). The

Government's attempt to discount the objected-to evidence as immaterial is belied by the plethora of references made to it throughout the record.  The Government admits that this evidence corroborated and reinforced its suspect witnesses.  Accordingly, substantial harm resulted.

## CONCLUSION

The Government's constitutional violations affected the fairness and integrity of Brown's trial.  Based on the foregoing, and the arguments submitted in his initial brief, Henry Brown respectfully moves this Honorable Court to reverse his conviction, remand for a new trial, or order any other equitable and appropriate relief.

Respectfully submitted,


s/ William S. Stanton


WILLIAM  S. STANTON
53 W. Jackson Blvd., Suite 1062
Chicago, IL 60604
(312) 588-1283

**CERTIFICATE OF SERVICE**

I hereby certify that on October 16, 2013, I electronically filed the foregoing reply brief with the Clerk of the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system.  All participants in the case are registered CM/ECF users, and service will be accomplished by the CM/ECF system.

<u>s/ William S. Stanton</u>

WILLIAM  S. STANTON
53 W. Jackson Blvd., Suite 1062
Chicago, IL 60604
(312) 588-1283

## **CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)(7)**

Undersigned counsel hereby certifies that he has performed a character count, via Microsoft Office Word, on the foregoing brief, and the number of words is less than 7,000 as set forth by Fed. R. App. P. 32(a)(7).  The total number of counted words is 6,986.

s/ William S. Stanton